984 So.2d 1050 (2008)
Michael SALTS a/k/a Michael I. Salts and Marie Salts a/k/a Alice Marie Salts, Appellants
v.
STATE of Mississippi, Appellee.
No. 2006-KA-00437-COA.
Court of Appeals of Mississippi.
April 1, 2008.
*1053 Jim Waide, Tupelo, attorney for appellants.
Office of the Attorney General by Deshun Terrell Martin, attorney for appellee.
EN BANC.

ON MOTION FOR REHEARING
MYERS, J., for the Court.
¶ 1. The motion for rehearing is granted; however, the appellants' motion for rehearing is denied. The original opinion is withdrawn and this opinion is substituted therefor.
*1054 ¶ 2. Michael Salts and Marie Salts were convicted by a Lee County jury of four counts of embezzlement and sentenced by the Lee County Circuit Court to a total of ten years each in the custody of the Mississippi Department of Corrections and an $11,000 fine.[1] The Saltses were also ordered to pay restitution. Aggrieved, the Saltses appeal and cite the following errors, which we quote verbatim:
1. MICHAEL SALTS AND MARIE SALTS WERE DENIED EFFECTIVE REPRESENTATION OF COUNSEL SINCE, THROUGH NO FAULT OF THEIR OWN, THEY HAD NO ATTORNEY WHO WAS PREPARED FOR TRIAL.
2. MICHAEL SALTS AND MARIE SALTS WERE DENIED THEIR CONSTITUTIONAL RIGHT TO EFFECTIVE REPRESENTATION OF COUNSEL, BECAUSE THEY WERE NEVER PERSONALLY ADDRESSED TO DETERMINE WHETHER THEY WISHED TO WAIVE ANY CONFLICT OF INTEREST. THIS VIOLATED UNITED STATES CONSTITUTION AMENDMENTS SIXTH [SIC] AND FOURTEEN'S RIGHT TO EFFECTIVE COUNSEL AND TO A FAIR TRIAL.
3. THE CIRCUIT COURT ERRED IN NOT DECLARING A MISTRIAL WHEN THE PROSECUTOR COMMENTED, ON TWO OCCASIONS, THAT ONLY THE "SALTSES" WOULD KNOW ABOUT WHETHER THE MONEY WHICH THEY RECEIVED FROM THE INSUREDS WERE FOR PREMIUMS DUE TO "THE INSURANCE COMPANY." THIS VIOLATED UNITED STATES CONSTITUTION AMENDMENTS FIVE AND FOURTEEN.
4. THE CIRCUIT COURT VIOLATED THE SALTSES' SUBSTANTIVE DUE PROCESS RIGHTS BY REFUSING TO GIVE AN INSTRUCTION STATING THAT CRIMINAL INTENT WAS REQUIRED FOR THE CRIME OF EMBEZZLEMENT. THIS VIOLATED UNITED STATES CONSTITUTION AMENDMENT FOURTEEN SINCE THE DUE PROCESS CLAUSE OF THE UNITED STATES CONSTITUTION REQUIRES PROOF OF CRIMINAL INTENT FOR THE COMMON LAW OFFENSE OF EMBEZZLEMENT.
5. THE INDICTMENT IS UNCONSTITUTIONALLY VAGUE SINCE THE SALTSES WERE NEVER TOLD PRIOR TO TRIAL WHO THE VICTIMS WERE, NOR WAS IT EVER SPECIFIED WHICH INSURANCE COMPANY IT WAS THAT WAS SUPPOSED TO HAVE BEEN THE RECIPIENT OF THE MONEY. THIS VIOLATED THE [SIC] SIXTH AND FOURTEENTH AMENDMENTS [SIC] RIGHT TO NOTICE OF THE CHARGE.
6. THE CIRCUIT COURT ERRED IN SENTENCING THE SALTSES FOR FELONIES WHEN THE LAW AT THE TIME OF SENTENCING WAS THAT THEY WERE ONLY GUILTY OF MISDEMEANORS.
¶ 3. We find no merit to any contentions that would require us to grant a new trial. However, we affirm in part, reverse in part and remand. Though not raised as an issue by the Saltses, we find that the trial court erred in ordering the Saltses to pay restitution to the policyholders because the policyholders who benefitted from the restitution lost nothing as a result *1055 of the Saltses' misconduct. Therefore, we also reverse the trial court's order of restitution and remand for further consideration.

FACTS
¶ 4. The Saltses owned and operated a funeral home in Booneville, Mississippi. For many years, the Saltses used Gulf National Insurance (Gulf) to provide funeral insurance for their customers. In the early 1990s, the working relationship between the Saltses and Gulf began to deteriorate, and in December 1994, Gulf terminated its relationship with the Saltses. Thereafter, the Saltses conducted their insurance business through a different insurance company, Magnolia Guaranty Life Insurance Company. However, many of the Saltses' customers continued to send their Gulf payments in to the Saltses rather than sending them directly to Gulf. Unfortunately, some of this money never made its way to Gulf from the Saltses. It was on the basis of these unforwarded payments that criminal charges were levied against the Saltses.[2]
¶ 5. On May 12, 2003, the Saltses were indicted for six counts of embezzlement. The original indictment alleged in Count I that the Saltses had embezzled $982.06 from Paula Cox between January 19, 1985, and July 3, 1998.[3] The Saltses were found not guilty of Count II, and Count III was withdrawn by the State. Count IV originally alleged that the Saltses had embezzled $923.10 from Jeanette Taylor between January 2, 1992, and January 3, 2000. Count V alleged that the Saltses had embezzled $1,025.62 from Charles and Clara Simmons between March 1, 1994, and November 15, 2000. Finally, Count VI alleged that the Saltses had embezzled $524.80 from Sara or James McGee between September 1, 1997, and March 2, 2002. All the counts stated that the Saltses "were bound to deliver the money to the insurance company or return same," but none of the counts specified to what insurance company the payments were intended to go.
¶ 6. The Saltses initially hired Steven Farese as their attorney. However, on September 2, 2003, Farese requested permission to withdraw from the case, stating "upon discussion of this matter with one of the Defendants that two separate irreconcilable conflicts arose. Based upon these conflicts, Defense Counsel is ethically and legally unable to defend either of the Defendants." The motion was granted by the trial court, and the Saltses then hired Michael Thorne to represent them. Unfortunately, Thorne was going through a bevy of personal problems, including serious illnesses in his immediate family. The record indicates that, after requesting and being granted numerous continuances, Thorne was still not prepared for trial.[4] Shortly before trial, Thorne attempted to get another continuance, stating that his father was gravely ill and was hospitalized and he needed more time to prepare for *1056 trial. The trial court never ruled on the motion, although it emphasized at the pretrial motion hearing that no more continuances were going to be granted in the case.
¶ 7. The Saltses fired Thorne on the Thursday before their Monday trial. On that Friday, the trial court dealt with pretrial motions, including a request by the Saltses for a continuance so that their new attorney, Jim Waide, could prepare for trial. The Saltses also requested that the hearing on the motions be held the next week, when Waide would be able to respond to the State's motions. The trial court refused to grant a continuance, noting: "It has taken me something in the neighborhood of six to eight months to arrive at a trial setting for this, not entirely because of things that the defendants did. . . . I have a venire panel coming in on Monday and, any thoughts about a continuance in this case, you can abandon that." After hearing further information from the Saltses and Thorne about the case, the court reiterated:
Until yesterday, sometime late in the afternoon, you were represented by an attorney who is thoroughly competent. Because of some disagreement with him you terminated his services and I assume have made arrangements for another attorney. . . . It has been a longstanding practice and rule that an attorney accepting employment in a case in the posture this one finds itself takes it on with all the responsibilities that go along with it, including being at this hearing.
Now, the fact that he is not here, that he is not familiar with the proceedings, has limited knowledge I assume of what this is all about, is not anything that I have to do with; and, therefore, I don't feel bound to extend any time or circumstance  any other circumstance, you know, because of that discharge of Mr. Thorne.
Thereafter, the Saltses indicated to the trial court that Thorne had not subpoenaed any witnesses and that "[t]here's nothing been done." The trial court continued to refuse a continuance and heard the pretrial motions.
¶ 8. The Saltses' trial was held as scheduled on Monday, October 3, 2005. After it had finished presenting its case-in-chief, the State orally amended the indictment to shorten both the length of time and the amount of money alleged to have been embezzled. Specifically, the State amended Count I to run from August 23, 1995, to August 3, 1998, and to allege only $272.14. This reduced the amount charged by around $700 and shortened the time frame by more than ten years. Count IV was amended to charge $298.50, a difference of more than $600, and to charge only the time between December 27, 1994, and January 3, 2000, a reduction of almost three years. The amendment to Count V alleged that the Saltses had embezzled $254.37 rather than $1,025.62, a difference of more than $750, and altered the time frame to run from December 29, 1995, to July 3, 1998, reducing the alleged time period by approximately three years. Finally, Count VI was amended from $524.80 to $285.58, a difference of more than $200; and its time frame was reduced approximately one year to run from June 25, 1998 to March 2, 2002. The Saltses' objections to these amendments were overruled by the court.
¶ 9. Thereafter, the Saltses presented their case-in-chief. After the close of all the evidence, the jury returned a verdict of guilty on the four counts described above. The Saltses filed post-trial motions, all of which the court denied. The Saltses also requested to be sentenced under Mississippi Code Annotated section 97-23-19 (Rev. *1057 2006), which provides that embezzlement of less than $500 is misdemeanor embezzlement, rather than Mississippi Code Annotated section 97-23-25 (Rev.2006), which treats all embezzlement the same. Alternatively, the Saltses contended that embezzlement of less than $500 should be treated as a misdemeanor, even under Mississippi Code Annotated section 97-23-25, because of section 99-19-17, which was repealed on July 1, 2003.[5] The trial court rejected the Saltses' request and sentenced them under section 97-23-25, with the exception of Count IV, which State had agreed would be considered misdemeanor embezzlement because it involved an amount under $250.[6]
¶ 10. Additional facts will be related during our analysis and discussion of the issues.

ANALYSIS AND DISCUSSION OF THE ISSUES
1. Denial of the Right to Effective Counsel
¶ 11. The basis of this claim is the trial court's failure to grant a continuance to allow the Saltses' attorney, Waide, to prepare for trial after he took the Saltses' case a few days before trial was set to begin. In order to present an adequate picture of this issue, we first discuss the chronological progression of this case.
¶ 12. The Saltses were indicted on May 12, 2003, and were arraigned on July 3, 2003, at which time Farese was acting as their attorney. On September 2, 2003, Farese filed a motion requesting that he be allowed to withdraw as counsel, and his request was granted by the court on September 18, 2003. The record contains nothing indicating exactly when Thorne was hired as the Saltses' attorney, but Thorne filed a motion requesting a continuance on February 19, 2004, citing Farese's failure to turn over discovery after his withdrawal. The motion indicated that trial was set for March 3, 2004. The trial court granted the motion on March 2, 2004.
¶ 13. The next trial date indicated in the record is June 22, 2004. On June 9, 2004, Thorne requested another continuance, stating that he "has not been able to properly prepare for this case due to other litigation involving these defendants." Thorne also stated in the motion that, due to the nature of the charges against the Saltses, it was possible that an accountant would have to be hired to review the case. The trial court granted the motion on June 14, 2004.
¶ 14. On September 24, 2004, with trial set for October 11, Thorne filed a third motion for continuance. Thorne again stated that he needed additional time because of "other litigation involving these defendants." The motion was granted by the court the same day. On October 8, 2004, the State filed a response to oppose the September 24 motion for continuance. In it, the State claimed that the March 2 continuance was granted because of "a conflict of interest between the Judge and the Defendants." The State noted that, due to the advanced age of many of its witnesses, it faced "a real possibility of impairment of prosecution." The State further noted that the Prentiss County *1058 Courthouse was closed for renovations, but a Prentiss County jury could hear the case in "any one of the neighboring courthouses within the first judicial district. . . ." Despite the fact that the order granting the continuance had been filed on September 28, 2004, the State appeared to be unaware that the trial court had already granted the motion.
¶ 15. Nothing else concerning the date of the trial is found in the record until March 29, 2005, when the trial court entered an order setting trial for June 27, 2005. Three days before that trial date, on June 24, Thorne filed a motion requesting a continuance because he planned to go out of state to seek medical treatment for his wife on June 26, 2005, he did not know when he would return. Thorne also indicated that the courthouse was still under renovation. The State filed a timely motion opposing the continuance. The trial court granted Thorne's motion, the fourth continuance in the trial, and set trial for September 6, 2005. The trial court stated that all pretrial motions were to be filed on or before August 1, 2005. An agreed order was entered on July 26, giving the Saltses until July 28, 2005, to file discovery. On August 1, the Saltses filed a witness list identifying twenty-one individuals.
¶ 16. On August 4, 2005, Thorne filed a number of motions, including a request for sealed documents, a motion for change of venue, a motion to dismiss the indictment, and a motion for discovery. On August 16, 2005, Thorne requested a continuance of the motion hearing then set for the next day, August 17, due to his father's illness and admittance to the hospital. On August 17, 2005, the trial court granted this motion, the fifth continuance granted on behalf of the Saltses. Thereafter, the trial court set the trial for October 3, 2005, in the Lee County courthouse.
¶ 17. On September 27, 2005, Thorne filed another motion for a continuance, the sixth filed on behalf of the Saltses. Thorne based this request on an illness in his immediate family and the need for additional time to prepare for the trial. On the same day, Thorne also filed a motion to sever the six counts of the indictment to have separate trials on each of the counts. On September 29, 2005, the Thursday before the Saltses' Monday trial date, the Saltses terminated Thorne's legal services. The following day, September 30, Thorne appeared with the Saltses for a hearing on pretrial motions. At the hearing, the Saltses related to the trial court that Thorne had not, in their opinion, adequately prepared for trial. The Saltses pointed out that Thorne had not subpoenaed any witnesses and had not met with them about the case. However, the trial judge did not grant a continuance because the case had already been continued for over a year. The Saltses informed the court that Waide had agreed to take over their case.[7]
¶ 18. The Saltses contend that, because of the short amount of time that Waide had to prepare for the case, they were denied effective representation of counsel. The Saltses further contend that this was through no fault of their own.
¶ 19. While we agree that the record reflects that the Saltses were not personally the source of the multiple continuances, the record reveals that their attorney had requested and had received numerous continuances. There is nothing in the record *1059 that suggests that Thorne's allegedly inadequate preparation for trial suddenly became known to the Saltses on the eve of trial. It appears that the Saltses had known for some time that Thorne had not done an adequate amount of work on their behalf, yet they were content to continue employing him so long as their trial date continued to be pushed back. If the Saltses were not the cause of the delays, they were at least complicit in Thorne's repeated continuance requests.
¶ 20. As support, the Saltses cite Lester v. State, 692 So.2d 755, 777 (Miss.1997) (overruled on other grounds) for the proposition that they "have the right to have an attorney who has adequate time to prepare for the trial." We find that the facts in Lester are radically different from the facts in this case. In Lester, the defendant was charged with the murder of his daughter while engaged in felonious child abuse. Id. at 765. At trial, the State attempted to introduce evidence that Lester had sexually abused his daughter prior to her death. Id. at 777. Lester objected and requested a two-week continuance to prepare a defense to the sexual abuse allegations. Id. The Mississippi Supreme Court found that the continuance should have been granted, as the one-hour delay granted by the court was not sufficient time for Lester to prepare an adequate defense to the sexual abuse evidence. Id. In this case, Thorne had over a year to prepare a defense for the Saltses. The Saltses apparently were aware that he had not done so to their satisfaction, yet they chose not to retain another lawyer. Under these circumstances, we cannot say that the Saltses were denied the right to have an attorney who had adequate time to prepare for trial. Instead, they chose to continue to retain an attorney who had adequate time but who allegedly did not prepare for trial. Lester provides no relief to the Saltses.
¶ 21. The Saltses also point to Lambert v. State, 654 So.2d 17 (Miss.1995).[8] In Lambert, the Mississippi Supreme Court reversed for failure to grant a continuance where the trial court found that the defendant had been represented by counsel for four months. Id. at 21. The supreme court noted that, although Lambert had been represented for four months, his trial was set for only one week after his arraignment. Id. at 20. The trial court ruled on a motion to sever the counts of the indictment on the morning of trial, deciding that that day's trial would be on one of the five counts with which Lambert was charged. Id. at 21. As the supreme court noted, "[t]his was the first indication that Lambert would not be tried on all five remaining counts that day." Id. One week later, a second trial was held on one of the remaining counts. Id.
¶ 22. In reversing Lambert, the supreme court noted that "Lambert's lateness in hiring counsel was not due to procrastination, but was the result of the short period of time between indictment and trial." Id. at 22. The supreme court noted that it was particularly troubled by the trial court's decision to wait until the morning of trial to inform defense counsel that only one of the counts would be tried that day. Id. The supreme court emphasized why four months was not sufficient time to prepare for trial, stating:

*1060 The trial judge's reasoning in denying the continuances indicates a clear abuse of discretion. The judge relied on the fact that counsel had been involved in the case since the preliminary hearing allowing him an opportunity to prepare since that time. However, the original charge against Lambert was different from those under which he was indicted. Counsel clearly indicated that he had not been in contact with Lambert since the preliminary hearing. Even if he had, it is not clear how he could have prepared a defense when the nature of the charges was not fully known at that time. This case does not involve just a single reason for the continuance but several. Id.

¶ 23. The facts in this case are notably different from those in Lambert. The Saltses were aware of the nature of the charges against them for roughly two years. Unlike Lambert, the Saltses' decision to retain Thorne rather than hiring a new attorney is attributable only to procrastination. No other reason has been presented by the Saltses. In light of the facts, we find that the Saltses were not denied their right to effective counsel who had adequate time to prepare for trial. Rather, the Saltses chose to retain counsel who they believe did not sufficiently prepare for trial.
¶ 24. We find Speagle v. State, 390 So.2d 990, 991 (Miss.1980) to be instructive on the denial of a motion for continuance. In Speagle, the Mississippi Supreme Court affirmed a conviction where a defendant terminated one lawyer and hired another shortly before trial. Id. The supreme court considered:
The defendant's principal assignment of error is that the lower court erroneously refused to grant him a continuance. He contends that his attorney needed more time to prepare for trial. The indictment was returned against Speagle on November 6, 1979. He appeared before the court on November 7, 1979, and stated that he had employed a lawyer. He was arraigned on November 12, 1979, and was represented by counsel, Mr. Ed Stevens, at that time. He pleaded not guilty and the case was set for trial on November 20, 1979. On November 19, 1979, Mr. William Sullivan, then representing the defendant, filed a motion for continuance, which was denied.
Id. at 991. The supreme court held "the voluntary substitution of counsel by a litigant during the course of trial is not, of itself, grounds for a continuance. The same can be said for the voluntary substitution of counsel prior to trial." Id. at 992 (citing Ladnier v. State, 273 So.2d 169, 172 (Miss.1973)). Like Speagle, the Saltses voluntarily substituted counsel shortly before trial. Furthermore, as we discuss below, the Saltses have not shown any prejudice that resulted to them as a result of the court's failure to grant them a continuance.
¶ 25. The decision to grant or deny a continuance is made at a trial court's discretion. Stack v. State, 860 So.2d 687, 691(¶ 7) (Miss.2003). In order to demand reversal, a trial court's denial of a continuance must result in "manifest injustice." Id. (quoting Gray v. State, 799 So.2d 53, 58(¶ 14) (Miss.2001)). "The burden of showing manifest injustice is not satisfied by conclusory arguments alone, rather the defendant is required to `show concrete facts that demonstrate the particular prejudice to the defense.'" Id. at 691-92 (¶ 7) (citations omitted).
¶ 26. The Saltses have presented no concrete facts to demonstrate any prejudice against them. Although Waide had a limited amount of time to interview witnesses and review the admittedly large *1061 amount of documents in the case, the Saltses have presented no evidence that this lack of time had any impact on their case. They point to no particular witness whose questioning might have made a difference, nor do they indicate that there is anything in the documents that could have been discovered had Waide had more time to review the case. In the absence of any showing of prejudice to the Saltses' case, we find that the Saltses have failed to show that the trial court abused its discretion in failing to grant them a last-minute continuance, especially in light of the fact that five continuances had already been granted to the defense over the course of almost a year and a half.
¶ 27. We also note that there was no error on the part of the trial court in failing to grant the continuance requested by Thorne prior to the Saltses' termination of his services. The Saltses point out that Thorne made the request due to family illness and Thorne's father did, in fact, die shortly thereafter. However, nothing in Thorne's motion indicated the gravity of his father's illness. Furthermore, the motion indicated that the illness was not the sole cause of the request, as the motion also stated that Thorne needed additional time to prepare for trial.[9]
¶ 28. This contention of error is without merit.
2. Conflict of Interest
¶ 29. The Saltses claim that they were denied their right to effective representation because they were never asked if they desired to waive their right to joint representation. The Saltses point out that the evidence showed that Michael had little to no bookkeeping skills, while very few of the funeral home customers dealt with Marie. Consequently, Marie took care of the business's books, while Michael dealt with customers. There also may have been evidence that either Michael or Marie did not work continuously at the funeral home during the time periods alleged in the indictment. The Saltses argue that this shows that there may have been a conflict of interest, and the joint representation made it impossible for either Marie or Michael to utilize this evidence to point the finger at each other. The Saltses also point to Farese's motion to withdraw as evidence that there was a known conflict between the Saltses.
¶ 30. Farese's motion reads in relevant part: "Steven E. Farese, Sr. would submit that upon discussion of this matter with one of the Defendants that two separate irreconcilable conflicts arose. Based upon these conflicts, Defense Counsel is ethically and legally unable to defend either of the Defendants." This motion contains, at best, an inference that Farese may have encountered a conflict of interest due to his representation of both Marie and Michael. However, it is also possible that Farese was indicating that, pursuant to his discussions with the Saltses, he discovered some other conflict that left him ethically unable to defend either Marie or Michael. We do not take the motion as proof that there was an actual conflict between Michael and Marie.
¶ 31. We find the pretrial discussion on this matter enlightening:
[PROSECUTOR]: Your Honor, as you recall, on the 28th of September we had a hearing in this matter at which *1062 time the defense attorney who stood up, I believe it was Mr. Michael Thorne, and represented to this Court that they would not be asking for a severance in this case between the defendants.
* * * *
[DEFENSE ATTORNEY]: Your Honor, my response to that is that the law requires that the defendants be addressed individually, that the prosecution bring it to the Court's attention, that they then be addressed individually. The attorney can't waive a conflict of interest. They have to be addressed individually and asked whether they waive a conflict of interest and consent to one lawyer representing both of them.
* * * *
[PROSECUTOR]: Your Honor, this matter was brought to the attention of Your Honor as we met in chambers, and the matter was thoroughly discussed, and the defense attorney discussed this matter with his clients.

[DEFENSE ATTORNEY]: Your Honor, if he's going to argue that, then I'd like to put the clients on to ask them whether it's ever been addressed with them. But it has to be addressed by the Court in open court, not outside the court.
[THE COURT]: You issue an instanter subpoena for Mr. Thorne and get him to testify about this matter. Now, if we're going to have a hearing, we're going to put Mr. Thorne on the stand, too, and find out what the discussion was. My recollection is that all this was aired in chambers and in open court. . . .
(Emphasis added.) A diligent search of the record has not revealed whether any discussion of any conflict of interest was made or waived in court. However, the averments of both the prosecutor and the trial court indicate that such a discussion did occur, that the Saltses were informed of the potential problems with their representation, and that they waived any conflict. Even if no such discussion took place, we would still find no merit to this contention of error for the reason discussed below.
¶ 32. As support, the Saltses cite Smith v. State, 666 So.2d 810 (Miss.1995). We find Smith distinguishable on its facts. In Smith, the same public defender represented both a defendant and his accomplice, who later became the "key eyewitness for the State. . . ." Id. at 811. The Mississippi Supreme Court found that this created an "irreparable actual conflict of interest once the trial began." Id. (emphasis added). As we will discuss further, it is this actual conflict that distinguishes Smith from the present case.
¶ 33. The Saltses also cite Armstrong v. State, 573 So.2d 1329 (Miss.1990). Like Smith, Armstrong involved an actual conflict of interest rather than a potential conflict. In Armstrong, the same attorney represented both Armstrong and his co-defendant. Id. at 1331. It was clear from the evidence that Armstrong's participation in the crime was far less than that of his co-defendant. Id. at 1333-34. However, at Armstrong's sentencing on his guilty plea, counsel did not raise any of the ameliorative factors that existed, "apparently fearing that too much information would incriminate [the co-defendant] more than . . . Armstrong." Id. at 1333. As in Smith, the Armstrong court noted that the conflict was not merely a potential conflict, stating:
This was not a case involving highly theoretical potential for conflict but one where it might easily have been anticipated that the defense attorney would argue that the actions of the one should *1063 not be attributed to the other which would create a conflict in the case and tend to throw more blame on the co-defendant . . . than on Armstrong. The converse is also true and counsel may opt to not say or do anything in mitigation for fear that to do so would characterize one as being more culpable than the other. This is exactly what occurred in the case sub judice, for the public defender neither said nor did anything in mitigation at the sentencing hearing in [sic] behalf of either Armstrong or [his co-defendant].
Id.
¶ 34. Mississippi law is clear that only an actual conflict of interest must be waived by co-defendants. Both Armstrong and Smith clearly state that the conflicts in those cases were actual, rather than potential. In Witt v. State, 781 So.2d 135, 137(¶ 7) (Miss.Ct.App.2000), this Court addressed the difference between an actual and a potential conflict, stating:
Mississippi has applied the [F]ifth [C]ircuit's definition of "actual conflict":
If a defense attorney owes duties to a party whose interests are adverse to those of the defendant, then an actual conflict exists. The interests of the other client and the defendant are sufficiently adverse if it is shown that the attorney owes a duty to the defendant to take some action that could be detrimental to his other client.
(quoting Irving v. Hargett, 518 F.Supp. 1127, 1144 (N.D.Miss.1981)). We specifically noted that a court needs to conduct an inquiry into the propriety of a joint representation only when an actual conflict has been shown. Id. at 137(¶ 7). In Witt, we held:
Another argument that Witt raises is that the lower court should have made an inquiry into the propriety of any multiple representation. The United States Supreme Court in Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), stated that "nothing in our precedents suggest that the Sixth Amendment requires state courts themselves to initiate inquiries into the propriety of multiple representation in every case." Id. at 346[, 100 S.Ct. 1708]. Taking this into consideration, the Cuyler court held: "Unless the trial court knows or reasonably should know that a particular conflict exists, the court need not initiate an inquiry." Id. at 347[, 100 S.Ct. 1708] (emphasis added). Both defendants had confessed and had been offered recommendations of identical sentences; the trial court had no reason to suppose an actual conflict existed. Without such, the court was not required to make such an inquiry.
Id. at 138(¶ 11) (emphasis added).
¶ 35. Because the Saltses never showed an actual conflict of interest, there was no need for any inquiry by the trial court into the propriety of joint representation. Nothing conclusively indicates that Michael or Marie had interests that were adverse to each other, or that Waide should have engaged in some course of conduct that would have been adverse to the interests of one or the other. The Saltses merely suggested that some of the evidence indicated the possibility of a conflict between Michael and Marie. We note that Marie took the stand and testified, essentially, that neither she nor Michael had ever embezzled the insurance money. The Saltses have at best shown a potential conflict, which does not require that the court make an inquiry into their joint representation. Furthermore, the record indicates that some inquiry was made, although apparently off the record. This contention is without merit.
*1064 3. Prosecutorial Statements
¶ 36. The Saltses contend that the trial court erred in not granting them a mistrial on the basis of comments made by the prosecutor during the course of the trial.
¶ 37. On the first occasion pointed out by the Saltses, Waide was questioning Thomas Keenum, a defense witness, when the following exchange occurred:
Q. Let me ask you this question. You represented a funeral home for a large number of years so you learned something about how the business operated, right?
A. Yes.
Q. Would you tell the jury whether or not it was in the Saltses' interest based upon your 
[PROSECUTOR]: Your Honor, I think the best people to do that would be Alice and Michael Salts, not Mr. Keenum, whether it was in their best interest to 
[COURT]: Let him finish his question, Counsel.
State your question again, Mr. Waide.
Q. How many years did you say you were the attorney for this business?
A. Some 27 years I believe.
Q. All right, sir. Does the funeral home make most of its money off of funerals or does it make most of its money off of collecting insurance premiums?
A. Funerals.
Q. Would you tell the jury whether or not it's in the interest of a funeral home owner to see that the insurance premiums are paid on burial insurance?
A. As a general rule it surely would be.
No objection was made in reference to the State's comment. Waide claims that he made no objection at the time because he felt that an objection would only draw more attention to the prosecutor's remark.
¶ 38. In the second incident, Waide was cross-examining Robert Spell, a witness for the State, when the following exchange took place:
Q. Tell you what, let me put it on the screen so I can show it to the jury. There's some type of record that we're looking up here regarding Cox, and it has some notations on it, NEA. Do you know what that means?
A. No, sir.
Q. Or BBA?
A. No, sir.
Q. Okay.
A. I could make an assumption, but I'm not sure exactly.
Q. Well instead of an assumption, why don't you do us this? With all your experience in the funeral business, what could funeral homes be collecting money for from a Magnolia policyholder other than just a Magnolia policy? What other types of things could they be collecting?
[PROSECUTOR]: Your Honor, I'd like to object. I think the best person to ask that question to would be the Salts.
[DEFENSE ATTORNEY]: Your Honor, if the Court please, with that comment 
[COURT]: He's already said he's not familiar with it. He doesn't know what it means. Anything that he might say would be an assumption on his part if I understand what he's already told you, Counsel. The objection will be sustained.

*1065 [ATTORNEY WAIDE]: Your Honor, may I approach the bench just a second?
[COURT]: Yes, sir.
The bench conference was not recorded by the court reporter. According to the Saltses, the prosecutor's comment was discussed, and the Saltses requested a mistrial. The State does not deny that this happened.
¶ 39. Although not mentioned by the Saltses, the State actually made three remarks to this effect. The first occurred before either of the incidents described by the Saltses, while Waide cross-examined Walter Blessey, a State witness:
Q. Sir, is it not true that beside sending the letters out, the Saltses also posted notices in the public newspaper that they were not agents of yours and to tell the public not to be paying them for your policies? Isn't that true?
[PROSECUTOR]: Your Honor, I'm going to have to object. He's badgering. He is constantly on our witness for hearsay, and then he's going to ask a question if this gentleman knows what the Salts did. The best people to ask about what the Salts did are the Salts themselves as far as what they did.
[DEFENSE ATTORNEY]: He's correct, Your Honor. I'll withdraw it.
¶ 40. Therefore, we have three distinct instances where the prosecutor in this case said something to the effect of "the best person to answer that question would be the Saltses themselves." The question is whether these remarks constitute an impermissible comment on the Saltses' right to testify, or not, as they chose.
¶ 41. We find Fears v. State, 779 So.2d 1125 (Miss.2000) to be helpful.[10] In Fears, the following exchange occurred during the defense attorney's questioning of a witness:
Q: And when he returned home, did he enter the house?
A: Yes
Q: Did he say anything to you?
A: Yes, he did.
Q: Do you recall what it was that he said?
[Mr. Pittman]: Your Honor, objection to hearsay.
The Court: I'm going to technically sustain.
Q: Did he say, Good morning, Grandma?
A: He said some things to me, but it wasn't 
[Mr. Pittman]: Your Honor, objection 
A:  and I'm not allowed to say that.
[Mr. Pittman]:  to anything he said as hearsay.
[The Court]: All right.
A: I'm not allowed to say, so I can't say it.
[Mr. Lawrence]: I don't understand the basis of the objection, Your Honor. Perhaps I need to return to law *1066 school, but if the Court may take the opportunity to educate me as to how a statement made from the defendant directly to her is hearsay. I'm not asking if he said anything regarding what anyone had stated.
[Mr. Pittman]: Because the defendant is here to testify about what he said.
Id. at 1128-29(¶ 16) (emphasis added). The supreme court noted that "[w]hether a comment is improper is determined on a case-by-case basis." Id. at 1129-30(¶ 20) (citing Strahan v. State, 729 So.2d 800, 807(¶ 27) (Miss.1998)). The ultimate question that must be answered is "whether the comment of the prosecutor can reasonably be construed as a comment upon the failure of [the accused] to take the stand." Id. at 1129(¶ 20) (quoting Ladner v. State, 584 So.2d 743, 754 (Miss.1991)).
¶ 42. In Fears, the Mississippi Supreme Court affirmed this Court's finding that "the prosecutor's comment was made in the context of a discussion on the admissibility of statements," and "that the remark was not directed to the jury and . . . was not improper." Id. at 1129(¶ 18). As in Fears, we find that the remarks in the present case were not directed to the jury.[11] Rather, they were made "in the context of a discussion on the admissibility of statements." While the objections could, perhaps, have been worded more carefully, we decline to find that the trial court erred in refusing to grant a mistrial on the basis of the remarks. The comments were made in an attempt to explain the State's objection and were not intended to comment on the Saltses' right to take or not take the stand. This issue is without merit.
4. Criminal Intent and Jury Instructions
¶ 43. The Saltses contend that the trial court erred when it refused to instruct the jury that specific intent to defraud is required to prove embezzlement. At trial, during the jury instruction conference, the State argued two theories: first, that specific intent is not a required element of embezzlement, and second, that "the fraudulent language [in the instructions] would establish the intent requirement if one was required." An off-the-record discussion was held, and the trial court then granted the State's instructions, which read in relevant part:
If you find from the evidence in this case beyond a reasonable doubt that:
1. Michael I. Salts and Alice Marie Salts, while doing business as Salts Funeral Home . . .
2. Fraudulently appropriated more than $250.00. . . .
Six instructions, all containing "fraudulently appropriated," were issued to the jury, at least one for each count in the indictment.[12] The Saltses contend that it is clear that the trial court issued the instructions because it "accepted the State's *1067 argument that the crime of embezzlement did not require any criminal intent." However, the record is not clear as to what the trial court believed when it issued the State's instructions, as the trial court could have accepted either of the State's arguments when it issued the instructions. Contrary to the Saltses' contentions, nothing in the record indicates that the trial court believed that embezzlement did not require specific intent.
¶ 44. We note at the outset that the Saltses are correct that embezzlement requires specific intent, even though the statute does not mention intent. See Morissette v. United States, 342 U.S. 246, 263, 72 S.Ct. 240, 96 L.Ed. 288 (1952). On appeal, the State argues that "fraudulently appropriated" is sufficient to denote intent. The Saltses contend that even if "fraudulently appropriated" could be used to denote specific intent, it could not do so here because "fraudulently" was not defined for the jury.
¶ 45. Although we have found no Mississippi case directly addressing this issue, we find United States v. Hummer, 322 F.Supp. 601 (N.D.Ill.1971) to be particularly helpful. The Hummer court found that an indictment was legally sufficient to charge embezzlement, even though it contained no mention of intent, because "embezzled" "connotes to both lawyers and laymen that the act alleged was done with wrongful and felonious intent." Id. at 602. In so finding, the court noted:
In United States v. Alexander, 415 F.2d 1352, 1357-58 (7th Cir.1969), the United States Court of Appeals for the Seventh Circuit approved the definition of "embezzlement" as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." Such a definition implicitly includes wrongful or felonious intent. A person could not fraudulently appropriate the property of another to himself without felonious intent.

Id. at 602 (emphasis added).
¶ 46. Here, the jury instruction stated that the Saltses were charged with embezzlement, and the jury should find the Saltses guilty if it found beyond a reasonable doubt that the Saltses had "fraudulently appropriated" various sums of money. Even without a separate definition, this language necessarily implied that the Saltses had intentionally defrauded the victims in this case. This contention of error is also without merit.
5. Propriety of Indictment
¶ 47. The Saltses contend that the indictment against them was fatally flawed because it failed to specify who the victims of their crimes were. The Saltses argue that this flaw was further compounded by the State's amendment of the indictment after the close of its case. We believe it would be helpful to address not only the sufficiency of the indictment, but also the propriety of the mid-trial amendment of the indictment.
Amendment
¶ 48. As we discussed in the facts portion of our opinion, the State orally amended the indictment after finishing its case-in-chief to drastically shorten both the alleged time period of the charges and the amount of money that the Saltses were alleged to have embezzled. In discussing the propriety of the amendment, the prosecutor stated that he had told the Saltses' previous attorney, Thorne, that he would seek such an amendment at trial in an e-mail sent several weeks before trial.
¶ 49. Rule 7.09 of the Uniform Rules of Circuit and County Court states: "All indictments may be amended as to form but not as to the substance of the *1068 offense charged." The Supreme Court held:
An amendment is one of form if the amendment is immaterial to the merits of the case and the defense will not be prejudiced by the amendment. Pool v. State, 764 So.2d 440, 443 (Miss.2000). "The test for whether an amendment to the indictment will prejudice the defense is whether the defense as it originally stood would be equally available after the amendment is made." Id.

Jones v. State, 912 So.2d 973, 976(¶ 9) (Miss.2005).
¶ 50. "[U]nless time is an essential element or factor in the crime, an amendment to change the date on which the offense occurred is one of form only." Conley v. State, 790 So.2d 773, 781(¶ 16) (Miss.2001) (quoting Baine v. State, 604 So.2d 258, 260 (Miss.1992)). Time is not an essential element or factor of the crime of embezzlement. Therefore, the amendment as to time was an amendment of form and was allowable. Furthermore, the Saltses have shown nothing to indicate that the amendment as to the dates negated a defense they would otherwise have had before the amendment.
¶ 51. As to the reduction in the amount of money that the Saltses were alleged to have embezzled, we find that our holding in Oby v. State, 827 So.2d 731, 735-36 (¶¶ 13-17) (Miss.Ct.App.2002), while not directly on point, is both helpful and relevant. In Oby, the defendant was indicted for possession of more than two grams of cocaine. Id. at 735(¶ 13). However, at trial the proof showed that Oby had possessed only .55 grams of cocaine. Id. The State moved to amend the indictment, and Oby objected, arguing that the amendment affected the substance of the charges against him. Id. at 735(¶ 14). While the amendment did not change the crime charged, it did lessen the penalty that could be imposed against Oby. Id. at 735(¶ 16). Nonetheless, we found that the amendment was one of form and accordingly affirmed Oby's conviction. Id. at 735-36 (¶ 17). Like Oby, the most that the Saltses can argue is that the reduced amount of money that they were charged with embezzling lessened the penalty that may be imposed against them. Either way, the essential crime of embezzlement remains intact.
¶ 52. We also find the following passage from Jones, 912 So.2d at 977(¶ 15) relevant:
Jones also argues that the lateness of the amendment to indictment prejudiced him since he relied on the original indictment to prepare his defense. However, Jones knew of the role of Grady Shoemaker in the alleged cocaine transaction which took place at the time of Shoemaker's and Jones's arrest and the importance of Shoemaker's potential testimony to the case. Therefore, Jones could not have been "surprised" by the State's attempt to prove Jones transferred cocaine to Shoemaker.
Like Jones, the Saltses cannot be surprised by the State's attempt to prove that they embezzled funds during a time period that had already been disclosed in the indictment. Furthermore, the amounts that the Saltses were alleged to have embezzled were reduced to amounts that were smaller than those charged in the indictment. Again, the Saltses cannot claim surprise that the State sought to prove that they embezzled those amounts of money, as the Saltses knew from their indictment that the State would attempt to prove embezzlement of at least those amounts.
¶ 53. In short, nothing has been presented to indicate that the State's amendment *1069 was one of substance rather than form.
Sufficiency of Indictment
¶ 54. The Saltses contend that the indictment is insufficient because it did not clearly identify who the victims of the embezzlement were, nor did it state from which insurance company the Saltses were alleged to have withheld funds. The Saltses argue that this deficiency was further compounded by the fact that the insured customers testified that their policies were through Gulf, but the State amended the indictment to include only dates after 1994, when the Saltses were no longer working with Gulf. The Saltses contend that they did not learn until trial who the intended victims were, as it was only at trial that the court ruled that the victims alleged in the indictment were the Saltses' customers. The original indictment, which was later amended as to the dates and amounts of money alleged to have been embezzled, reads in pertinent part:
MICHAEL I. SALTS and ALICE MARIE SALTS ("defendants"), in said County and State and within the jurisdiction of this court, individually or while aiding and abetting or acting in concert with each other . . . did unlawfully, wilfully, feloniously and fraudulently embezzle and appropriate more than Two-hundred Fifty dollars ($250.00) in lawful United States money, the personal property of Paula Cox, in that: (1) Paula Cox delivered or caused to be delivered to the defendants by checks or currency the aggregate amount of approximately $982.06 as premium payments on insurance policies to cover burial and funeral expenses; (2) the said money was delivered on trust by which the defendants, as agents of Paula Cox, and doing business as Salts Funeral Home, were bound to deliver the money to the insurance company or return same; and (3) instead of delivering or returning the money as the defendants were bound to do under the said trust, the defendants embezzled and appropriated said money. . . . [13]
¶ 55. We find no merit to the Saltses' contention that the testimony of the victims confused this matter. If anything, the fact that the Saltses were no longer working with Gulf during the dates in the indictment strengthened the State's case. If the Saltses had no working relationship with Gulf, they had no reason whatsoever to retain checks that belonged to Gulf. There is no evidence that any of the checks in question were returned to the individuals who had sent them. Consequently, we find the Saltses' argument as to any confusion on this point to be without merit.
¶ 56. As to the Saltses' contention that the indictment was unclear as to who the victims in this case were, we find no merit to this either. The only named entities in the indictment were the customers who had paid sums to the Saltses that had not been forwarded to the appropriate entity. Therefore, it is only logical that the customers were the alleged victims. This interpretation is consistent with the statute that the Saltses were indicted under, which reads:
If any person shall fraudulently appropriate personal property or money which has been delivered to him on deposit, or to be carried or repaired, or on any other contract or trust by which he was bound to deliver or return the thing *1070 received or its proceeds, on conviction, he shall be punished by. . . .
Miss.Code Ann. § 97-23-25 (Rev.2000). The statute does not specify who the victim of an embezzlement is. In the case before us, there were arguably two victims  the customers whose payments were never received by the insurance company and the insurance company who never received the payments. The indictment clearly put the Saltses on notice as to the State's theory of who the victims were  namely, the customers whose payments were not properly forwarded.
¶ 57. We also find no fault with the indictment for not specifying an insurance company. Ultimately, the Saltses had customers who were paying them for insurance, but those payments were not being forwarded as they were supposed to be. In fact, there is no evidence that these payments were forwarded to any insurance company. In order to be sufficient, an indictment must "be a plain, concise and definite written statement of the essential facts constituting the offense charged and . . . fully notify the defendant of the nature and cause of the accusation." URCCC 7.06. The indictment here fully notified the Saltses as to the nature of the charges against them. We find no merit to this contention.
¶ 58. We also find no merit to the Saltses' contention that their customers could not be the victims because civil law construes payment to an insurer's agent to be the same as payment to the insurer itself. While this would be relevant in a civil suit involving these same claims, this principle does not operate to mean that the customers could not be the victims of a crime involving the embezzlement of the funds. The Saltses have presented no authority that says that this principle of civil law can operate to prevent a criminal embezzlement charge. This issue is without merit.
6. Sentencing
¶ 59. On appeal, the Saltses contend that they should have been sentenced under Mississippi Code Annotated section 99-19-17, which created a relationship between embezzlement of less than $250 and petit larceny, and which was repealed in 2003, prior to the Saltses' trial. Before its repeal, Mississippi Code Annotated section 99-19-17 read as follows:
In convictions for obtaining money under false pretenses, and for embezzlement, if the value of the money or property received, obtained, or embezzled, be less than Two Hundred Fifty Dollars ($250.00), the offense shall be punished as petit larceny.
The Saltses contend that the amendment of the larceny statute at the same time to create a $500 threshold meant that embezzlement of less than $500 should not be treated as a felony because "[t]he rule that statutes are not to be given an absurd construction, compels that embezzlement be given the same interpretation as petit larceny and that one must have embezzled more than $500 for there to be a felony."
¶ 60. We disagree with the Saltses' analysis that the Legislature must have intended to implicitly create a threshold limit of $500 for embezzlement in 2003. The statute that created the relationship between petit larceny and embezzlement, section 99-19-17, was repealed in 2003. The larceny statute does not indicate anything about embezzlement. Furthermore, Counts I, IV, V, and VI all charged greater amounts than $250. Thus, the repealed statute would have no applicability in any event. We do not find what the Legislature did to be absurd, and any complaint that the Saltses have with the statutes as they are written must be taken up with the Legislature, not this Court.
*1071 ¶ 61. Furthermore, we do not find that the concept of lenity demands that the Saltses be resentenced according to Mississippi Code Annotated section 97-23-19 (Supp.2007),[14] which reads:
If any director, agent, clerk, servant, or officer of any incorporated company, or if any trustee or factor, carrier or bailee, or any clerk, agent or servant of any private person, shall embezzle or fraudulently secrete, conceal, or convert to his own use, or make way with, or secrete with intent to embezzle or convert to his own use, any goods, rights in action, money, or other valuable security, effects, or property of any kind or description which shall have come or been intrusted to his care or possession by virtue of his office, place, or employment, either in mass or otherwise, with a value of Five Hundred Dollars ($500.00) or more, he shall be guilty of felony embezzlement, and, upon conviction thereof, shall be imprisoned in the Penitentiary not more than ten (10) years, or fined not more than Ten Thousand Dollars ($10,000.00), or both. If the value of such goods, rights in action, money or other valuable security, effects, or property of any kind is less than Five Hundred Dollars ($500.00), he shall be guilty of misdemeanor embezzlement, and, upon conviction thereof, shall be imprisoned in the county jail not more than six (6) months, or fined not more than One Thousand Dollars ($1,000.00), or both.

(Emphasis added).
¶ 62. Our supreme court and this Court, alike, have held numerous times that where two or more statutory provisions could apply to the same conduct, the State is not required to prosecute an individual under a statute providing for a lesser penalty. Jenkins v. State, 888 So.2d 1171, 1174 (Miss.2004); Martin v. State, 732 So.2d 847, 855(¶ 33) (Miss.1998); Clubb v. State, 672 So.2d 1201, 1204 (Miss.1996); Beckham v. State, 556 So.2d 342, 343 (Miss.1990); Weaver v. State, 497 So.2d 1089, 1092 (Miss.1986); Cumbest v. State, 456 So.2d 209, 222 (Miss.1984); Grillis v. State, 196 Miss. 576, 586, 17 So.2d 525, 527 (1944); Torrey v. State, 816 So.2d 452, 454(¶ 4) (Miss.Ct.App.2002). In the event that a defendant's conduct can be classified under two different statutes, the defendant is entitled to sentencing under the statute providing the lesser penalty if, and only if, the indictment, itself, is ambiguous as to which the defendant is charged under. Jenkins, 888 So.2d at 1174; Martin, 732 So.2d at 855(¶ 33); Clubb v. State, 672 So.2d at 1204; Beckham, 556 So.2d at 343; Weaver, 497 So.2d at 1092; Cumbest, 456 So.2d at 222; Burns v. State, 438 So.2d 1347, 1353 (Miss.1983); Grillis, 196 Miss. at 586, 17 So.2d at 527. This Court has held that when the specific code section under which the defendant is charged appears in the indictment, the indictment is not ambiguous. Torrey, 816 So.2d at 454 (¶ 4).
¶ 63. In this case, the Salts were initially indicted under Mississippi Code Annotated section 97-7-25 (Rev.2006). The indictment was later amended to reflect the charges under Mississippi Code Annotated section 97-23-25 (Rev.2006). Section 97-23-25 remained the section under which the Salts were tried, convicted, and sentenced. There existed no ambiguity in the indictment against the Salts. Thus, because there is no ambiguity, the defendant is not entitled to sentencing under the statute with the lesser penalty, Mississippi *1072 Code Annotated section 97-23-19. Torrey, 816 So.2d at 454 (¶ 4). This contention is without merit.
7. Restitution
¶ 64. Although not raised as an issue by the Saltses, this Court reverses the lower court's grant of restitution in favor of the individual policyholders. Mississippi Code Annotated section 99-37-1(c) (Rev.2007) states that restitution is "full, partial or nominal payment of pecuniary damages to a victim." (emphasis added). Section 99-37-1(b) defines pecuniary damages as "all special damages, but not general damages, which a person could recover against the defendant in a civil action arising out of the . . . defendant's criminal activities and shall include, but not be limited to, the money equivalent of property taken, destroyed, broken or otherwise harmed, and losses such as medical expenses."
¶ 65. The problem with the restitution rendered in favor of the policyholders is that the Saltses' customers (the policyholders) did not lose anything that could be recovered in a civil action. While the Saltses embezzled their money, the insurance company reinstated each of the victim's insurance policies upon proof of payment to the Saltses. Therefore, there are no damages that the Saltses' customers could obtain in a civil action arising out of the embezzlement. Therefore, there were no pecuniary damages to the policyholders. Consequently, we reverse the trial court's award of restitution to the policyholders and remand the issue of restitution to the trial court for further consideration with respect to the rightful victim, Gulf.
¶ 66. THE JUDGMENT OF THE CIRCUIT COURT OF LEE COUNTY IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART AS FOLLOWS: EACH ARE SENTENCED TO COUNT I  CONVICTION OF EMBEZZLEMENT AND SENTENCE OF FIVE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AND FINE OF $10,000 IS AFFIRMED; COUNT IV  CONVICTION OF MISDEMEANOR EMBEZZLEMENT AND SENTENCE OF SIX MONTHS IN THE CUSTODY OF THE PRENTISS COUNTY SHERIFF'S DEPARTMENT AND FINE OF $1,000 IS AFFIRMED; COUNT V  CONVICTION OF EMBEZZLEMENT AND SENTENCE OF FIVE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED; AND COUNT VI  CONVICTION OF EMBEZZLEMENT AND SENTENCE OF FIVE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. SENTENCE IN COUNT I TO RUN CONSECUTIVELY WITH SENTENCE IMPOSED IN COUNT V AND CONCURRENTLY WITH SENTENCES IMPOSED IN COUNTS IV AND COUNT VI. SENTENCE IN COUNT VI IS TO RUN CONCURRENTLY WITH SENTENCES IMPOSED IN COUNTS I, IV AND V. MICHAEL SALTS IS SENTENCED AS A HABITUAL OFFENDER. MICHAEL SALTS AND MARIE SALTS'S SENTENCES TO BE SERVED IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS. THE ORDERS OF RESTITUTION ARE REVERSED AND REMANDED FOR FURTHER CONSIDERATION CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE TO BE DIVIDED EQUALLY BETWEEN LEE COUNTY AND THE APPELLANTS.
*1073 KING, C.J., LEE, P.J., GRIFFIS, ISHEE AND CARLTON, JJ., CONCUR. IRVING AND BARNES, JJ., DISSENT WITHOUT WRITTEN OPINION. CHANDLER AND ROBERTS, JJ., NOT PARTICIPATING.
NOTES
[1] The Saltses were indicted on six counts of embezzlement. The State opted to withdraw one count, and the jury acquitted the Saltses of another.
[2] The dates in the original indictment indicate that the State believed, at some point, that the embezzlement had gone on long before Gulf terminated its relationship with the Saltses. However, the only evidence of criminal conduct introduced at trial concerned acts after the termination of the relationship.
[3] This count was amended before trial to extend the date to August 3, 1998, rather than July 3, 1998.
[4] For example, it is uncontradicted that Thorne did not subpoena any witnesses to testify on the Saltses' behalf. Thorne indicated in his final continuance request that he needed more time in part because he was not prepared for trial.
[5] These statutes will be discussed in more depth in our analysis of the issues.
[6] Although Count IV still involved an amount over $250 when it was orally amended, the jury was given two instructions regarding Count IV: a standard instruction for an amount over $250 and a lesser-included instruction for misdemeanor embezzlement in the event that the jury found that the Saltses had embezzled less than $250 from the victim.
[7] Waide later indicated that he believed that he was joining the case to help Thorne, not to replace him as counsel. Waide entered a formal appearance on September 30, although the transcript of the hearing indicates that he had not made the appearance at the time of the hearing.
[8] In their reply brief, the Saltses also cite Hughes v. State, 589 So.2d 112, 113-15 (Miss. 1991). However, Hughes, like Lambert, involves a defendant who had a very short period of time (three weeks) between indictment and trial. Id. at 113. This left Hughes' hired attorney with eight days to prepare for trial, a short amount of time that was compounded by the attorney's problems communicating with the prosecutor in the case. Id. at 113-14. The facts in this case are notably different, as we discuss in relation to Lambert.
[9] The first indication that the trial court was made aware of the gravity of Thorne's father's illness was at the pretrial hearing on September 30, where Marie told the court: "His wife's been sick and his dad's dying." This statement was related to the trial court after the Saltses had fired Thorne and after the trial court had released him from his service in the case.
[10] In their initial appeal brief and in their reply brief, the Saltses urge this Court to take into account two cases from other jurisdictions that the Saltses claim support their position. The Saltses acknowledge that these are not Mississippi cases, but argue that this Court should address them anyway. As support, the Saltses cite Leflore v. State, 726 So.2d 261, 263-64(¶ 9) (Miss.Ct.App.1998), where this Court used a Nebraska case to address an issue that had never been presented to a Mississippi appellate court. Since Fears, despite the Saltses arguments to the contrary, is relevant, binding precedent regarding the issue raised here, we do not address the non-Mississippi cases cited by the Saltses as support.
[11] The Saltses attempt to distinguish Fears on the ground that the defendant in Fears failed to object to the remark when it was made. Fears, 779 So.2d at 1129(¶ 18). However, two of the three comments at issue in this case also were not objected to by the defendants. Furthermore, we find nothing in the holding of Fears that is altered by the fact that the statement in Fears was not objected to. It is clear that the comment was held to be proper because it was not a comment on the defendant's right to testify. Nothing in the Fears holding turns on the fact that the statement had not been contemporaneously objected to.
[12] Count III had already been withdrawn by the time that jury instructions were given. As already discussed, two instructions were given for Count IV: one for an amount over $250 and one for an amount under $250.
[13] The other counts of the indictment are similarly worded, with the exception of the amounts of money, dates, and names of the victims, which were altered to create each separate count.
[14] The Saltses argued this theory to the court below, but they did not raise it in their appeal to this Court.